## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCHUFF STEEL COMPANY**, <br><br> Plaintiff, <br><br> v. <br><br> **BOSWORTH STEEL ERECTORS**, *et al.*, <br><br> Defendants. <br><br> ——————————— <br><br> **BOSWORTH STEEL ERECTORS**, <br><br> Counter-Plaintiff, <br><br> v. <br><br> **SCHUFF STEEL COMPANY**, <br><br> Counter-Defendant. | Civil Action No. 18-cv-0435 (TSC) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Schuff Steel Company ("Schuff") has sued Defendant Bosworth Steel Erectors, Inc. ("Bosworth") and Defendant Travelers Casualty and Surety Company of America ("Travelers"), alleging two causes of action: (1) breach of contract against Bosworth and (2) breach of performance bond against Bosworth and Travelers. Compl., ECF No. 1. Bosworth filed two counterclaims against Schuff, which it later amended, alleging breach of contract and unjust enrichment/*quantum meruit*. First Am. Counterclaim, ECF No. 19. Travelers has moved for summary judgment against Schuff on Count 2 of the Complaint. ECF No. 56. Bosworth has also moved for summary judgment against Schuff on Count 1 and its counterclaims. ECF No. 57. Schuff has filed cross-motions for summary judgment against Travelers on Count 2, and

against Bosworth on Count 1 and Bosworth's counterclaims.  ECF Nos. 67, 69.  For the reasons set forth below, the court will **GRANT** Travelers' motion for summary judgment against Schuff; **DENY** Schuff's motion for summary judgment against Bosworth; **DENY** Schuff's motion for summary judgment against Travelers; and **DENY** Bosworth's motion for summary judgment against Schuff.

## I.      BACKGROUND

On July 14, 2018, the D.C. United Major League Soccer team notched their first win in front of 20,504 fans in their newly constructed stadium.  *See* Emily Giambalvo, *DC United debuts Audi Field, and Wayne Rooney, in a convincing win over Vancouver*, Wash. Post, July 14, 2018.  The stadium—which had only been substantially completed two days earlier—is made up of approximately 5,000 tons of structural steel, to which vast precast concrete step and seat structures are fastened.  Schuff Mot. for Summ. J. against Travelers ("Schuff-Travelers MSJ"), Statement of Facts ¶¶ 2, 47 ECF No. 68-1 ("Schuff-Travelers SOF").

Schuff was subcontracted to detail, fabricate, and erect the steel framing and precast sections by the stadium's general contractor—Turner Construction Company ("Turner")—two years earlier.  *Id.* ¶ 3.  Schuff, in turn, sub-subcontracted the work of erecting and installing those sections to Bosworth, in a contract valued at $7,975,000 (the "Subcontract").  *Id.* ¶ 4.  The Subcontract—executed on September 11, 2017—required Bosworth to erect the precast concrete structures within 16 weeks, complete the steel erection within 25 weeks, and to lift and install the stadium's scoreboard.  *Id.*, Ex. N., Schuff-Bosworth Subcontract at 12 § 3, 15 § 29(a)(i), ECF No. 68-15.  Time was of the essence, as the Subcontract indicated, with DC United's opening game less than a year away.  Schuff-Travelers MSJ at 18-19.  Indeed, Bosworth began its work in June of 2017, several months before the Subcontract was executed.  Schuff-Travelers SOF ¶ 7.  Speed, however, was not to come at the expense of safety.  Bosworth agreed to numerous safety

requirements, including several related to lifting heavy objects with cranes. Subcontract, Attach. 4, Safety Requirements § 26, *Cranes and Derricks*. Specifically, Bosworth was required to submit a plan to Turner considering potential hazards and contingencies for any lift exceeding 75% of a crane's rated capacity—a "critical lift." *Id.* § 26(b)-(c). A critical lift could not take place until Turner, Schuff, Bosworth, and other "appropriate parties" met to discuss and approve that critical lift plan. *Id.*

The Subcontract also contemplated the possibility of default, indicating that Bosworth would be "in material breach . . . should it (a) refuse or fail to property execute the work . . . [or] (c) fail to properly perform any and all obligations set forth" in the Subcontract. Subcontract at 4-5 § 14. Following a written notice of default from Schuff, Bosworth would have two working days to commence to cure any alleged defect or deficiency. *Id.* § 14(a). Should Bosworth fail to do so, Schuff had the right to terminate the Subcontract and use Bosworth's "materials, implements, equipment, appliances, or tools . . . to complete the work." *Id.* § 14(a)(3). The Subcontract allowed Schuff to terminate without the standard two-day notice "[i]n the event of an emergency affecting the safety of persons or property." *Id.* § 14(b).

The Subcontract also required Bosworth to obtain a surety bond for full performance of the Subcontract in a form acceptable to Schuff. Travelers Mot. for Summ. J. against Schuff ("Travelers MSJ"), Statement of Facts ¶¶ 2-3, ECF No. 56-2 ("Travelers SOF"). Travelers issued a bond, naming Bosworth as Principal and Schuff as Obligee, which Schuff accepted. *Id.* ¶¶ 4-5. The bond provided that, should Bosworth default, Travelers was to have "a reasonable period of time" to either (1) take over the Subcontract, (2) obtain bids from qualified contractors to complete the Subcontract, or (3) waive its right to perform or complete the Subcontract and determine, "with reasonable promptness under the circumstances," whether to pay or deny

Bosworth's remaining liability under the Subcontract. *Id.*, Ex. 2, Subcontract Performance Bond at 1, ECF No. 56-4 ("Bond").

## A.  **The Scoreboard Lift and Bosworth's Termination**

Bosworth was scheduled to lift the stadium scoreboard into place on September 21, 2017. Schuff-Travelers SOF ¶ 17.  Schuff claims Bosworth repeatedly assured Schuff management that the scoreboard lift would not be a critical lift and told Turner that the lift would be only 50-65% of the crane's capacity. *Id.* ¶¶ 14-15.  Indeed, by the morning of the lift, Bosworth had not filed a critical lift plan. *Id.* ¶ 13.

As the scoreboard began to rise on the morning of September 21, so did the suspicions of Turner's on-site Project Safety Manager, Cameron Bichler, that the scoreboard lift was in fact a critical lift. *Id.* ¶ 16.  Bichler entered the area, seeking to speak with the crane operator about its capacity, but left after being cursed at by several Bosworth employees and asked to leave. *Id.*, Ex. RR, Bichler Email at 3 (Sept. 21, 2017, 1:40 PM), ECF No. 68-45.[1]  After further investigation, Bichler determined that the lift was at least at 90% of the crane's capacity, and Bosworth was instructed to stop the lift and return the scoreboard to the ground. *Id.*  Turner banned Bosworth's safety manager from the project site, and Bosworth subsequently fired him. Schuff-Travelers SOF ¶ 17.

Bosworth prepared a new lifting plan that day, intending to reattempt the lift at 7:00 AM on September 22.  Bosworth Mot. for Summ. J. ("Bosworth MSJ"), Statement of Facts ("Bosworth SOF"), Ex. E, Hurst Email at SCHUFF0002688, ECF No. 57-2.  Schuff submitted

---

[1] Normally, the court cannot consider hearsay on a motion for summary judgment. *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  But because neither party objected to consideration of this email on hearsay or any other grounds, and because it likely falls under one of the hearsay exceptions, the court will consider it.

that plan to Turner on Bosworth's behalf that evening.  *Id.* at SCHUFF0002685.  By 6:25 AM on

the morning of the 22nd, Turner's safety team had not yet approved the plan.  *Id.*, Ex. F. Golden

Email at 1.  Accordingly, the lift was cancelled.  *Id.*, Ex. EE, Thompson Dep. at 118:3-7.

Schuff and Bosworth proffer different versions of what occurred between September 22

and September 26.  Bosworth claims it worked diligently with Schuff to incorporate and revise

the scoreboard lifting plan based on comments from Turner.  Bosworth SOF ¶ 17.  Schuff then

submitted the revised plan to Turner at 7:40 AM on September 26.  *Id.* ¶ 18.  Bosworth alleges

that during that time, Schuff began taking surreptitious steps to take over the project from

Bosworth in violation of the Subcontract.  Those steps included making housing arrangements

for Schuff managers and supervisors to come to Washington, *id.* ¶ 21, preparing hazard analyses

for Bosworth's scope of work, *id.* ¶¶ 22-23, compiling onboarding materials for new Schuff

employees, *id.* ¶¶ 24-25, preparing an "Action Item List" identifying "the discrete tasks and

responsible Schuff employee to accomplish the termination and takeover of Bosworth's

remaining scope of work," *id.* ¶¶ 26-28, and representing to internal and external stakeholders

and vendors that Schuff would be taking over Bosworth's contracts and equipment rentals and

that Bosworth had been terminated, *id.* ¶¶ 29-35, 37.

Schuff tells a different story.  It claims that by September, Bosworth had fallen behind

schedule on the project.  Schuff Mot. for Summ. J. against Bosworth ("Schuff-Bosworth MSJ"),

Statement of Facts ¶ 20, ECF No. 70-1 ("Schuff-Bosworth SOF").  And that after the failed lift,

there were only discussions, not plans, that Bosworth might reattempt the scoreboard lift.  *Id.* ¶

50.  Schuff alleges that while Bosworth did eventually resubmit a plan to Schuff, the final plan

submitted to Turner was independently created and submitted by Schuff.  *Id.* ¶ 51.  Schuff does

not dispute that it took the actions Bosworth claims, but characterizes them as preparation for the

possibility of having to take over the Subcontract after providing notice of default, to ensure there would be minimal disruption to an already-behind project schedule. Schuff-Bosworth SOF ¶ 20. Schuff does agree, however, that it was considering allowing Bosworth to reattempt the scoreboard lift. *Id.* ¶ 57.

At 3:00 PM on September 26, Schuff and Bosworth representatives met at the site to discuss terminating Bosworth from the project. Schuff-Bosworth SOF ¶¶ 52-53. Schuff and Bosworth discussed what would be required to reach a mutually amicable resolution, including the possibility of reattempting the scoreboard lift and a financial settlement. *Id.* ¶¶ 54-55. Bosworth's Vice President of Operations testified that while Bosworth rejected Schuff's initial settlement offer, the intention of all parties was to spend the week determining a settlement figure. *Id.*, Ex. D, V. Bosworth Dep. at 360:8-361:7. A journal entry from Schuff's Eastern Region Vice President also indicates that Schuff told Bosworth that it would be terminated for convenience if it complied with certain "points," including undertaking the scoreboard lift and several other tasks. Bosworth SOF, Ex. Z, Farrell depo Ex. 6. Bosworth's CEO John Bosworth expressed that he did not intend to move forward with the scoreboard lift. Schuff-Bosworth SOF, Ex. II, J. Bosworth Dep. at 94:12-95:1. In any event, it is undisputed that Bosworth knew that it was to demobilize and depart the stadium site by September 29, 2017. Bosworth SOF ¶ 57.

Bosworth and Schuff representatives met at least twice on the morning of September 27th. The first meeting, an impromptu gathering around a pickup truck, focused on how to make Schuff's takeover of Bosworth's work "as orderly as possible." Schuff-Bosworth SOF, Ex. II, J. Bosworth Dep. at 96:6-15. A second meeting at 11:00 AM became more heated. After a Schuff representative tendered a new settlement offer, Bosworth's CEO became irate, declaring "you're

not going to fuck me to tears" on this project.  *Id.* at 100:7-12.  Following this outburst, Bosworth's CEO left the site, attended a lunch in D.C., and flew back to Bosworth headquarters in Texas.  *Id.* ¶ 64.

Two hours later, at 1:20 PM, Schuff issued a "Notice of Default and Intent to Terminate Subcontract" to Bosworth, deeming Bosworth's failure to submit a critical lift plan for the scoreboard a "material default of its obligations" because it "created an emergency affecting the safety of persons and the Project."  *Id.*, Ex. CC, Default Not., ECF No. 70-30.  The notice also cited other problems in the construction process, including "[f]ailure to properly staff the Project at the appropriate levels, . . . general lack of planning/coordination of activities, . . . failure to install the West canopy deck correctly, . . . [and] [d]elays caused by Bosworth as a result of all of the foregoing."  *Id.* at 2.  The notice concluded, "this termination will become effective two working days from receipt of this notice" unless Bosworth provided "more qualified manpower, a detailed recovery schedule, [a] plan to address the serious safety situation and appropriate remedial actions, and a specific plan including adequate assurances acceptable to Schuff to address each and every item contained in this Notice."  *Id.* at 3.

Bosworth's Vice President of Operations responded to the notice by requesting an additional working day to continue settlement discussions.  Schuff-Bosworth SOF, Ex. HH, V. Bosworth Email, ECF No. 70-35.  Schuff did not respond to this email, *id.*, Ex. D, V. Bosworth Dep. at 360:14-18, but a Schuff Vice President sent Bosworth's Vice President of Operations a text message on the evening of the 27th, indicating that if Bosworth and Schuff reached a settlement, the termination would be changed to one for convenience, rather than default, *id.*, Ex. II, V. Bosworth-D. Farrell Text Messages, ECF No. 70-36.  Between September 27th and September 29th, Bosworth's crews began to demobilize, completing in-progress tasks and

beginning to clean up debris.  Bosworth SOF ¶ 69; *Id.*, Ex. LL, Ritchey Dep. 151:3-21; *Id.*, Ex. MM., Avery Dep. 223:1-12.

Schuff sent Bosworth a "Notice of Failure to Cure Default" at 3:11 PM[2] on September 29, indicating that Bosworth had "failed to adequately address or sufficiently remedy the material defaults identified in the default notice."  Bosworth SOF, Ex. BB, Not. of Failure to Cure Default, ECF No. 57-2.  The letter also alleged that Bosworth had "demobilized and abandoned the project."[3]  *Id.*  Bosworth responded at 5:46 PM with a letter denying that it had demobilized and claiming that Schuff had violated the Subcontract's default provisions by failing to allow it two working days to commence to cure.  *Id.*, Ex. CC, Bosworth Default Response at 1, ECF No. 57-2.  Bosworth also included what would have been its "substantive response to the Notice of Intent letter," in which it objected to the characterization of the scoreboard lift as an emergency and rebutted the other issues Schuff presented in its Notice of Default.  *Id.* at 2-3.

## B. The Surety Bond

Schuff notified Travelers of Bosworth's default at 6:13 PM on Friday, September 29.  Travelers SOF ¶ 29.  Schuff stated that it was "forced to continue with the work while Travelers is investigating this matter" to mitigate damages and avoid impacts to the "general contract."  *Id.*, Ex. 15, Schuff's Sept. 29, 2017 Not. to Travelers, ECF No. 56-17.  The following Wednesday, October 4, Travelers began investigating the claim, speaking with the claim underwriters, and

---

[2] Bosworth and Schuff both use Central Daylight Time in reference to the Notice.  The court will convert the time to Eastern Daylight Time for uniformity with the other pleadings and this court's Opinion.

[3] Schuff alleges that Bosworth had fully demobilized from the site at 3:02 PM.  Schuff-Travelers SOF ¶ 27.  Schuff made this claim as part of its Statement of Facts in support of Summary Judgment against Travelers, however, and therefore Bosworth did not have the opportunity to dispute it.

identifying the reasons for Bosworth's default.  Schuff-Travelers SOF, Ex. GG, Travelers'

Claims Notes at 5-6, ECF No. 68-34.  On October 5, Travelers contacted Bosworth's CEO for

further information as to why the termination was for default, rather than convenience.  *Id.* at 5.

Travelers responded to Schuff by letter on October 6, acknowledging that Bosworth had

defaulted per the terms of the Bond and requesting correspondence, plans, specifications, and

other documents related to the Subcontract, as well as those related to the scoreboard lift.

Travelers SOF, Ex. 16, Travelers' Oct. 6, 2017 Letter at 1-2, ECF No. 56-18.  Travelers also

indicated that it was "unable to verify that Schuff has acted in accordance with the bonded

contract in . . . taking over Bosworth's equipment and scope of work or in retaining an outside

subcontractor to complete and supplement the work." *Id* at 2.  The letter made clear that

Travelers' response was not "consent or authorization" for Schuff to elect to self-perform the

remainder of the Subcontract, and Schuff's continuing to complete Bosworth's scope of work

"may operate to prejudice [Travelers'] rights under the Performance Bond." *Id.*

Schuff responded on October 20, stating that "in order to mitigate potential damages for

all involved, Schuff is self-performing the erection." *Id.*, Ex. 18, Schuff Oct. 20, 2017 Letter at

1, ECF No. 56-21.  In response to Travelers' request for documents, Schuff provided only the

Subcontract and a letter sent on October 17 to Bosworth (which is not included in the record).

*Id.*  Travelers nonetheless continued to investigate the claim.  Schuff-Travelers SOF, Ex. GG,

Travelers' Claims Notes at 3-5.

On November 15, Travelers emailed Schuff, repeating its request for additional

documentation "necessary for us to complete an investigation of Schuff's claim."  Travelers

SOF, Ex. 19, Travelers' Nov. 15, 2017 Letter at 1, ECF No. 56-22.  Travelers also asked to visit

the stadium construction site in the last week of November.  *Id.*  Finally, Travelers offered to

meet with Schuff at its offices to "understand the basis of Schuff's claim and for the most efficient exchange of information" necessary to complete its investigation "as soon as possible." *Id.*

Schuff agreed to a visit "solely for [Travelers] to collect information / observe the progress on the project" on November 20, 2017.  Schuff-Travelers SOF, Ex. EE, Donahue-Carey Email, ECF No. 68-32.  Schuff permitted one Travelers representative and one Bosworth representative to attend and arranged for the visit to be chaperoned by the Schuff on-site project executive, warning that it would not allow "any debate or deposition questioning of" the executive.  *Id.*  Schuff also indicated that its subcontract on the stadium was "scheduled to be substantially complete by the 1st week of January."  *Id.*, Ex. DD, Donahue-J. Bosworth Email, ECF No. 68-31.  Only thereafter would Schuff turn to reconciling the remaining contractual expenditures and the breadth of its claim against the Bond.

Schuff and Travelers agree that Travelers' visit lasted no more than 30 minutes, although each blames the other for the meeting's brevity.  *Compare* Travelers' SOF ¶ 38 ("Schuff finally agreed to allow a limited site visit to occur on November 29, 2017, which meeting [sic] lasted no more than thirty minutes."), *with* Schuff-Travelers SOF ¶ 40 ("Travelers' site visit was 'not very long, maybe—no more than 30 minutes' and in the course of the site visit 'there was really no in-depth questions or answers' asked by the Travelers representative.") (quoting *Id.*, Ex. J, J. Avery Dep. at 239:19-240:11, ECF No. 68-11).  Thereafter, Travelers monitored Schuff's progress on the stadium via online webcam.  *Id.* ¶¶ 42-43.

On January 2, 2018, Travelers sent a third letter to Schuff, again requesting documents, adding requests for dated "shop drawing submittal logs, . . . fabrication schedules and steel delivery dates, . . . and copies of all correspondence between Schuff and Bosworth with regard to

timely completion of the Work." *Id.*, Ex. II, Travelers Jan. 2, 2018 Letter, ECF No. 68-36.

Schuff responded via email two weeks later, stating that "much of what you have requested can

be obtained directly from your principal, Bosworth Steel Erectors," and that Schuff would need

to review Travelers' new requests. *Id.*, Ex. JJ, Sherman-Donahue Email at 1, ECF No. 68-37.

Schuff stated that it would provide more information the following week, and that it was nearing

completion on a "proposed close-out reconciliation" with Bosworth. *Id.* Schuff provided the

requested documents on February 22, 2018. *Id.*, Ex. KK, Schuff Document Submission, ECF

No. 68-38.

**C.  Procedural Background**

On February 26, 2018, Schuff sued Bosworth and Travelers.  Compl., ECF No. 1.  Count

1 of the Complaint alleges one count of breach of contract against Bosworth and seeks damages

of at least $1 million. *Id.* ¶¶ 28-30, 41A.  Count 2 alleges that Bosworth and Travelers are jointly

and severally liable to Schuff for breach of the Bond, *id.* ¶¶ 31-40, and, contending that Travelers

has not paid its claim under the Bond, seeks at least $1 million in damages. *Id.* ¶¶ 37-38.

Travelers denies liability as to Schuff's claims on the Bond.  Travelers' Answer, Affirmative

Defenses ¶ 6, ECF No. 8.  Bosworth filed two counterclaims against Schuff for breach of

contract and unjust enrichment.  First Am. Counterclaim ¶¶ 29-54, ECF No. 19.  After discovery

closed—and after Schuff's motion for judgment on the pleadings was denied without prejudice,

ECF No. 17; Mar. 3, 2020 Min. Order—Travelers moved for summary judgement on Count 2,

the only claim against it, ECF No. 56.  Bosworth also moved for summary judgment on Count 1

and its counterclaims.  ECF No. 57.  Schuff cross-moved for summary judgment against

Travelers on Count 2, ECF No. 67, and against Bosworth on Count 1 and Bosworth's

counterclaims, ECF No. 69.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is material if "a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). A movant for summary judgment must identify the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opponent must present its own evidence beyond the pleadings showing that there are genuine factual issues for trial. *Id.* at 324. "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 236 (D.D.C. 2017) (internal quotation omitted). "Both motions must be denied if the court finds that there is a genuine dispute of material fact." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2720 (4th ed.).

Federal courts must decide the "threshold" issue of their own jurisdiction, including standing. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94-95 (1998). A court may consider if a plaintiff has standing at any time. *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994). A plaintiff carries the burden of establishing that they have the requisite constitutional and prudential standing to sue. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At the summary judgment stage, the plaintiff must "set forth by affidavit or other

evidence 'specific facts'" supporting their claim to standing. *Lujan v. Defs. of Wildlife*, 504 U.S.
555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).

### III.    ANALYSIS

### A.  <u>Schuff and Bosworth's Claims under the Subcontract</u>

Schuff and Bosworth each moved for summary judgment against the other on the
respective claim and counterclaims arising from the Subcontract.  Both contend that, as a matter
of law, undisputed facts compel the success of their causes of action and the failure of those
raised against them.  Schuff further argues that Bosworth lacks standing to bring its
counterclaims.  Having reviewed the record, the court finds that each party's claims involve
genuine issues of material fact, and whether Bosworth has standing depends in turn upon the
resolution of those claims.  As a result, the court will deny both motions for summary judgment.

### 1.  <u>Schuff's Claim Against Bosworth</u>

Schuff claims that Bosworth breached the Subcontract by failing both to perform its
contractual duties and to remedy its defective performance.  Compl. ¶¶ 28-30.  The alleged
failures to perform include the cancelled critical lift and various other defects in staffing,
timeliness, and quality control.  *Id.* ¶ 13.  The alleged failure to remedy occurred when Bosworth
did not commence to cure those defects during the two-day notice period beginning September
27, 2017.  *Id.* ¶¶ 15-16.  Schuff's Motion for Summary Judgment against Bosworth insists that
undisputed facts now validate both of those assertions.  Schuff-Bosworth MSJ at 8-24.

The relevant facts are far from undisputed, however.  With respect to the scoreboard's
critical lift, for example, Bosworth asserts that it had "cured or commenced to cure any . . .
deficiencies," by cooperatively completing and submitting to Schuff a new plan in the days
following the cancelled lift.  Bosworth Opposition to Schuff's Mot. for Summ. J. and Reply in
Support of Mot. for Summ. J. at 29 ("Bosworth Opp. and Reply"), ECF No. 74.  Schuff

disagrees, characterizing that communication between the parties as merely discussing the possibility of Bosworth subsequently performing the lift. *Compare* Bosworth SOF ¶¶ 12-18, *with* Schuff-Bosworth SOF ¶¶ 3-4, *and* Schuff-Bosworth MSJ at 21 & n.10. And according to Bosworth, the other failures were not cured only because Schuff instructed Bosworth to demobilize rather than cure them, an assertion Schuff also denies. *Compare* Bosworth SOF ¶¶ 53, 63, *and* Bosworth Opp. and Reply, Statement of Facts at 4, ¶¶ 8-9, ("Bosworth Supp. SOF"), ECF No. 74-1, *with* Schuff-Bosworth SOF ¶¶ 24-25. Likewise, Bosworth presents—and Schuff disputes—other facts that, according to Bosworth, confirm Schuff's instructions to demobilize, such as Schuff's preparations to staff and supply the project itself, *compare* Bosworth SOF ¶¶ 21-34, 44, 64-66, *with* Schuff-Bosworth SOF ¶¶ 5-11, 16, 31-34, as well as Schuff's internal communications, *compare* Bosworth SOF ¶¶ 47-51, *with* Schuff-Bosworth SOF ¶¶ 14-15, 18-22. These disputed facts create genuine issues as to whether and why Bosworth failed to perform or remedy.

In addition, the parties dispute at least two important facts related to whether Schuff's termination of Bosworth for default was procedurally valid. First, Bosworth asserts that the September 27, 2017 Notice of Default was not an opportunity to cure any of the claimed defaults, whereas Schuff maintains that it was. *Compare* Bosworth SOF ¶¶ 59, 63, *with* Schuff-Bosworth SOF ¶¶ 12, 19, 27, 30. Second, in response to Bosworth's argument that Schuff failed to provide the contractually required two working days to cure or commence to cure any noticed defaults, Schuff contends that no such notice was required because the September 21, 2017 attempt at lifting the scoreboard amounted to an "emergency affecting the safety of persons or property." *See* Schuff-Bosworth MSJ at 17 (quoting Subcontract § 14(b)). But the Subcontract does not define the term "emergency," and the parties marshal substantial and conflicting

evidence as to whether the cancelled lift so qualifies.  *Compare* Schuff-Bosworth SOF ¶¶ 35, 40, 44, 45, *with* Bosworth Supp. Facts at 1-3, ¶¶ 2-6, *and id.* at 8, ¶ 12.  Here, too, then, the weight of evidence on either side of the disputed facts calls into genuine issue whether Bosworth actually breached the Subcontract.

Because these genuine issues of material fact persist, Schuff's claim of breach against Bosworth is not appropriate for resolution by summary judgment.

2.   <u>Bosworth's Counterclaims Against Schuff</u>

   i.   *Counterclaim I: Breach of Contract*

Bosworth's primary counterclaim is that Schuff breached the Subcontract in two respects. First, Schuff failed to pay the full amount that it owed Bosworth for work covered by the base Subcontract, work performed pursuant to a change order process, and extra work necessitated by deficiencies in the materials Schuff provided to Bosworth.  First Am. Counterclaim at 13, ¶¶ 32-36.  Second, Schuff violated its duty of good faith and fair dealing by acting "arbitrarily, in bad faith and with ill motive towards Bosworth."  *Id.* at 15-16, ¶¶ 44-46.

As an initial matter, whether Schuff owes Bosworth for the extra work it performed turns on disputed questions of fact.  To be sure, the Subcontract provides that "there will be no compensation for extra work done without written authorization from Schuff," Subcontract ¶ 11, and Bosworth has largely failed to provide evidence of prior written authorization for the extra work at issue, *see* Schuff-Bosworth MSJ at 26-27; Schuff-Bosworth SOF ¶¶ 77-85.  But that language does not necessarily end the inquiry.  Under longstanding D.C. law, a provision requiring written authorization for extra work "in a written contract does not prevent the parties from making separate parol agreements regarding extras."  *Shapiro v. Bimblich*, 101 A.2d 890, 892 (D.C. 1954).  And it does not preclude Schuff from waiving that provision's requirements, even by implication.  13 Williston on Contracts § 39:14 (4th ed.) (describing "the general

principle of contract law that either party to a contract may waive virtually any contractual provision or right in its favor"); *see, e.g.*, *Blake Const. Co. v. C. J. Coakley Co.*, 431 A.2d 569, 577 (D.C. 1981) (considering whether contractor had impliedly waived the requirements of certain "explicit provisions" in a subcontract, but holding that, "on this record," it had not); *L. J. Robinson, Inc. v. Arber Const. Co.*, 292 A.2d 809, 812 (D.C. 1972) (contractor impliedly waived right to reject goods from subcontractor by failing to object to repeated deliveries).

The nature of Schuff's interactions and communications with Bosworth are essential to determining whether there were separate parol agreements or waiver here. But the parties contest several critical details. On the one hand, Bosworth asserts that the parties had settled on a "standard business practice" of contemporaneously documenting construction issues requiring extra work and their cost, then submitting that documentation to Schuff for payment—a process they had engaged in for months before executing the Subcontract, and which even afterward Schuff continued to honor for pre-execution extra work. Bosworth Supp. SOF at 5, ¶¶ 1-3; *id.* at 8, ¶ 11; *id.* at 9, ¶¶ 14-15. Bosworth also points to several instances in which Schuff personnel directed Bosworth to perform extra work without the full written authorization contemplated by the Subcontract. *Id.* at 6-8, ¶¶ 6-9. On the other hand, Schuff (1) disputes that Bosworth's "standard business practice" was the agreed-upon process for this project, (2) disputes that Bosworth properly complied with that practice by contemporaneously documenting and timely submitting extra work, and (3) claims that some of the extra work was not actually necessary and that Schuff—had it been timely notified—would have directed Bosworth to not complete it. Schuff Reply in Support of Mot. for Summ. J. ("Schuff Reply"), Statement of Facts at 1-6, ¶¶ 1-6 ("Schuff Supp. SOF"), ECF No. 77-1. These disputed facts are material to whether Schuff "acquiesced" to an alternative extra work billing process, *Blake Const. Co.*, 431 A.2d at 577,

such that a separate parol agreement or waiver of the Subcontract's written-authorization requirement could be implied.

Assessing Schuff's good faith and fair dealing similarly requires a fact-based analysis. If a "party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach." *C & E Servs., Inc. v. Ashland, Inc*., 498 F. Supp. 2d 242, 262 (D.D.C. 2007) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)). Bosworth argues that Schuff so breached when it "dangled a termination for convenience as a carrot to compel Bosworth to perform certain work before leaving the Project on September 29," then proceeded to proceeded to terminate Bosworth for default instead. Bosworth MSJ at 16.

But whether Schuff actually engaged in that conduct—and, consequently, whether it engaged in bad faith or unfair dealing—depends on disputed facts. The parties disagree, for instance, on whether there is sufficient evidence that Dave Farrell, Schuff's Eastern Region Vice President of Operations, promised a termination for convenience if Bosworth complied with Schuff's requests. *Compare* Bosworth SOF ¶¶ 51-52 (relying on Farrell's journal entry), *and* Bosworth Supp. SOF at 4, ¶ 7, *with* Schuff-Bosworth SOF at 10-11, ¶ 17 (questioning the contemporaneity of the entry), *and id.* at 13-14, ¶¶ 22-23 (same), *and id*. at 38-40, ¶¶ 54-61 (disputing whether term "termination for convenience" was actually used). *See also* Schuff-Bosworth SOF, Ex. II, V. Bosworth-D. Farrell Text Messages, ECF No. 70-36 (text message from Dave Farrell to Bosworth's Vice President of Operations, suggesting that a settlement would result in termination for convenience). The parties also contest whether Bosworth ultimately performed any of the "certain work," or "points," that Schuff requested. *Compare*

Bosworth SOF ¶ 69, *with* Schuff-Bosworth SOF at 24, ¶ 34.  These competing factual assertions preclude summary judgment.

    ii.    *Counterclaim II: Unjust Enrichment*/Quantum Meruit

Bosworth also seeks recovery for its unpaid change order work and extra work via a counterclaim of unjust enrichment or *quantum meruit*.  First Am. Counterclaim ¶¶ 47-54.  Although Bosworth cannot recover under this second counterclaim if it succeeds on the first, D.C. law permits Bosworth to alternatively seek relief through this cause of action.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 9 n.10 (D.D.C. 2009).  Bosworth contends that it was induced into providing services, materials, and supplies to Schuff through the Subcontract, which Schuff improperly terminated.  As a result, Bosworth asserts that it has been damaged, and Schuff has been unjustly enriched, by the value of the change order work and extra work Bosworth performed.  First Am. Counterclaim ¶¶ 47-54.

Under D.C. law, unjust enrichment and *quantum meruit* are theoretically distinct claims, but require similar factual premises.  As the D.C. Circuit has explained, *quantum meruit*

> rests on a contract implied in fact, that is, a contract inferred from the conduct of the parties. This cause of action has four requirements: "1) valuable services rendered by the plaintiff; 2) for the person from whom recovery is sought; 3) which services were accepted and enjoyed by that person; and 4) under circumstances which reasonably notified the person that the plaintiff, in performing such services, expected to be paid."

*U.S. ex rel. Mod. Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 246 (D.C. Cir. 1996) (quoting *Providence Hospital v. Dorsey,* 634 A.2d 1216, 1218 n.8 (D.C. 1993)).  By contrast, unjust enrichment "rests on a contract implied in law" and "is possible in the absence of any contract, actual or implied in fact."  *Id.* at 247 (citing *Bloomgarden v. Coyer,* 479 F.2d 201, 210 (D.C. Cir. 1973).  It "requires a showing that 'a person retains a benefit . . . which in justice and equity belongs to another.'"  *Id.* (citing *4934, Inc. v. District of Columbia Dep't of Emp. Servs.*, 605

A.2d 50, 55 (D.C. 1992)).  "Because of the similarities between these causes of action, evidence to support recovery under a contract implied in fact [*quantum meruit*] will often be of the same sort necessary to prove an unjust enrichment claim." *Id.*

Here, Bosworth's key contentions for its counterclaim of unjust enrichment or *quantum meruit* are that Schuff (1) improperly terminated the contract (2) without providing due compensation to Bosworth.  But as explained in the previous sections, *supra*, both of those contentions involve genuine issues of material fact.  For the same reasons, this counterclaim is not appropriately resolved by summary judgment.

3.   Bosworth's Standing to Raise Counterclaims

Schuff asserts that Bosworth lacks standing to bring its counterclaims because Bosworth's indemnification agreement with Travelers assigned its "legal rights to the damages and claims asserted in Bosworth's Counterclaim[s]" to Travelers.  Schuff-Bosworth MSJ at 6. Those rights include standing to sue.  *See, e.g.*, *Lans v. Digit. Equip. Corp.*, 252 F.3d 1320, 1324 (Fed. Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (applying D.C. Circuit law to hold that assignment of rights includes standing to sue)).

Whether Bosworth has standing turns on the outcome of Schuff and Bosworth's competing claims.  The Bond contemplates that Travelers' obligations would only arise if (1) Bosworth was in default under the Subcontract, (2) Bosworth had been declared by Schuff to be in default, and (3) Schuff had complied with its obligations under the Subcontract.  Bond at 1. The Indemnity Agreement states that a declaration of Bosworth's default by Schuff or actual breach or abandonment of the Subcontract would constitute a default.  Schuff-Bosworth SOF, Ex. O, Gen. Agreement of Indem. at § 1.  If, as Schuff argues, Bosworth was in default or properly declared to be in default, and Schuff was in compliance with the Subcontract, then Bosworth's rights would be assigned to Travelers.  But if Bosworth was not in default, or

Schuff's declaration of default was procedurally defective, then the triggering conditions would not be met, and Bosworth would retain standing to bring its counterclaims. The same is true if Schuff materially breached the contract, as Bosworth claims, before the (declaration of) default. *See Rosenthal v. Sonnenschein Nath and Rosenthal, LLP*, 985 A.2d 443, 452 (D.C. 2010) (a party's material breach excuses the nonbreaching party's contractual obligations).

In sum: Both Schuff's Count 1 claim against Bosworth and Bosworth's counterclaims against Schuff involve genuine issues of material facts. And because Bosworth's standing turns on the resolution of those issues, it likewise does not supply grounds for granting summary judgment. Therefore, the court will deny Bosworth's Motion for Summary Judgment, ECF No. 57, and deny Schuff's Motion for Summary Judgment against Bosworth, ECF No. 69.

**B.** **Schuff and Traveler's Claims**

Schuff and Travelers have cross-moved for summary judgment on Count 2 of Schuff's Complaint: breach of the performance bond. Travelers alleges that Schuff's decision to self-perform the Subcontract without allowing Travelers the contractually provided "'reasonable period of time' to elect an option to choose a performance option" is a material breach of the Bond that discharges Travelers' obligations. Travelers SOF ¶ 30. Schuff argues that Travelers unreasonably delayed acting on Schuff's bond claim, and that Schuff fully complied with all the Bond's conditions.

Under District of Columbia law, "[n]otice provisions in insurance contracts are of the essence of the contract." *Travelers Indem. Co. of Ill. v. United Food & Comm. Workers Int'l Union*, 770 A.2d 978, 991 (D.C. 2001) (quoting *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 768 (D.C. 1995)). Notice provisions guarantee that the insurer is able "to make prompt investigation and prepare to defend any action that may be brought." *Id.* (quoting *Lee v. Travelers Ins. Co.*, 184 A.2d 636, 638 (D.C. 1962)). Thus, when a "policy

expressly makes compliance with its terms a condition precedent to liability . . . , failure to comply with the notice provision will release the insurer of liability." *Id.*; *see also Hunt Const. Grp., Inc. v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1122 (D.C. Cir. 2009) (holding that a failure to comport with a notice provision means that "the surety has no liability on the bond").

Because notice provisions are of the "essence" of the surety contract, courts avoid reading them in a manner that would result in the "nonsensical" outcome of foreclosing the surety's right to remedy the default itself. *Hunt Const. Grp.*, 587 F.3d at 1121.  In a case involving a bond like the one here, the D.C. Circuit held that a surety's liability to an obligee was discharged, despite the absence of any "timely notice" provision in the bond, when the obligee terminated its subcontract with the principal and then waited nine months to notify. *W. Surety Co. v. U.S. Eng. Const., LLC*, 955 F.3d 100, 105 (D.C. Cir. 2020).

Schuff argues that no such discharge occurred because it "provided immediate notice to Travelers of Bosworth's default and termination of the Subcontract."  Schuff-Travelers MSJ at 36.  Schuff contends that Travelers' "reasonable period of time" to elect an option began when it received that notice, and Schuff had no further duty to Travelers other than to mitigate damages by forging ahead on construction as opening day approached.  *Id.* at 18-19.  Schuff argues that, if anything, it exceeded the scope of what it was required to do by providing Travelers with the two documents and allowing a site visit.  *Id.* at 25-26.  Schuff maintains that Travelers could have elected any of its three options—takeover, soliciting bids, or proceeding to investigate whether to grant or deny the claim—at any point after receiving notice; Travelers' failure to do so was its own fault.

Schuff's reasoning undermines the fundamental basis for notice provisions in surety contracts outlined above, which is to ensure that a surety's bargained-for "right to remedy the

default itself" is protected. *Hunt Const. Grp.*, 587 F.3d at 1121. Just as the surety must have reasonable notice so as to investigate a claim, so too must it have a reasonable period of time to elect which remedial option to pursue. *See W. Surety Co.*, 955 F.3d at 106 (remarking favorably on the 11th Circuit's holding that when an obligee engages in self-help "before the surety has an opportunity to respond to the termination, the surety's obligations under the bond are discharged") (quoting *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 681 F. App'x 771, 776-77 (11th Cir. 2017)). By timely notifying Travelers and then immediately electing to self-perform, Schuff presented Travelers with a choice between something or nothing, which is no true choice at all.

Schuff's last argument—that it was simply following its duty to mitigate damages by self-performing—is misplaced. Schuff contends that the project could not afford even the slightest delay because the stadium had to be ready by D.C. United's opening day. Schuff-Travelers MSJ at 19. But if this is true, then Schuff could have mitigated damages by promptly responding to Travelers' request for documents when Schuff received it on October 6, rather than nearly five months later (and indeed, four days before filing suit). By immediately self-performing after notice, Schuff did not just reduce Traveler's reasonable period of time in which to elect a remedial option, it foreclosed it.

It is undisputed that Schuff immediately began self-performing upon notifying Travelers of its bond claim. That immediate performance prevented Travelers from electing a remedial option, let alone a reasonable one. The court may thus find as a matter of law that Travelers did not breach the performance bond, as Schuff claims in Count 2. The court will therefore grant Travelers' motion for summary judgment (ECF No. 56) as to Count 2 of the Complaint and deny Schuff's motion for summary judgment (ECF No. 67) as to Count 2 of the Complaint.

1. <u>Remaining Matters</u>

Schuff seeks to recover on Count 2 of its Complaint against Travelers and Bosworth under a theory of joint and several liability.  Compl. ¶ 32.  Schuff's motion for summary judgment, however, did not address Bosworth's liability on Count 2, and Bosworth's motion for summary judgment addressed only Count 1 and its own counterclaims.  One count—breach of the performance bond—against one Defendant—Bosworth—thus remains unaddressed.

Federal Rule of Civil Procedure 56(f) contemplates summary judgment independent of any party's motion.  The court may consider or grant summary judgment "[a]fter giving [the parties] notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f); *see also Pinson v. United States Dep't of Justice*, 246 F. Supp. 3d 211, 230 n.20 (D.D.C. 2017) (considering summary judgment absent a clear motion when the losing party was on notice that they had to come forward with all their evidence) (quoting *Athridge v. Rivas*, 141 F.3d 357, 361 (D.C. Cir. 1998)).

Consequently, the court will order the parties to meet and confer and file a joint status report indicating whether and how they would like to address this issue.

## IV.    CONCLUSION

For the foregoing reasons, the court will **GRANT** Travelers' motion for summary judgment against Schuff, ECF No. 56; will **DENY** Schuff's motion for summary judgment against Bosworth, ECF No. 69; will **DENY** Schuff's motion for summary judgment against Travelers, ECF No. 67; and will **DENY** Bosworth's motion for summary judgment against Schuff, ECF No. 57.

The court will also order the parties to meet and confer and file a joint status report indicating whether and how they would like to address the issue of Count 2 against Bosworth.

A corresponding order will accompany this memorandum opinion.


Date: September 28, 2022


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge